Marvin Lunsford v. Commissioner. Jetta Fern Lunsford v. Commissioner.
Lunsford v. Commissioner
Docket Nos. 28228, 28294.
United States Tax Court
1952 Tax Ct. Memo LEXIS 202; 11 T.C.M. (CCH) 554; T.C.M. (RIA) 52169; May 29, 1952
Wentworth T. Durant, Esq., 601 Mercantile Sec. Bldg., Dallas, Tex., and Robert A. Wilson, Esq., for the petitioners. D. Louis Bergeron, Esq., and Tom F. Reese, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Fiscal
Taxpayer
year ended
Deficiency
Marvin Lunsford
July 31, 1946
$ 4,189.67
July 31, 1947
21,593.69
Calendar Year
Jetta Fern Lunsford
1946
$ 3,929.64
1947
13,553.03 The Commissioner claims an increase of $ 1,694.29 in the deficiency against Jetta for 1946. The issues for decision are: (1) whether Marvin's father, brother and sister were real partners in the conduct of a candy manufacturing business during the period from August 1, 1945 until the business was sold *203 in February 1946; (2) the basis to Marvin of a candy business sold by him to Marvin's Inc.; (3) whether Marvin realized gain on the sale of the Colgate house; (4) whether the Commissioner erred in determining that Marvin's community income for his fiscal year ended July 31, 1947 included $ 30,638.04 representing royalties and $ 28,700.92 representing other benefits from Marvin's Inc. and whether the petitioners correctly reported Marvin's salary from Marvin's Inc.; (5) whether Marvin realized gain in connection with the surrender of 480 shares of stock of Marvin's Inc.; (6) whether the stock of Marvin's Inc. became worthless during the taxable years; (7) whether the Commissioner erred in computing the income from a used car business to be 15 per cent of gross sales rather than the amount shown by the records of the business; (8) whether the petitioners are entitled to deductions as a result of debts becoming worthless; and (9) whether the deficiency against Jetta for 1946 should be increased by the disallowance of a net operating loss carry-back from 1948 on the basis of which the Commissioner tentatively allowed an overassessment for 1946. Findings of Fact Marvin *204 Lunsford and Jetta, his wife, filed separate returns for the taxable years on a community property basis with the collector of internal revenue for the Second District of Texas. Marvin filed his for fiscal years ending July 31st and Jetta filed hers for the calendar years. Marvin was divorced from his wife Eula on February 9, 1945, and married Jetta on December 22, 1945. Marvin had been employed in the furniture business for a number of years prior to March 17, 1942, when he and his uncle became equal partners in a candy manufacturing business. They ceased to be partners in July 1943 and divided between them sugar quotas allotted to their business by the O.P.A. Marvin then discussed with his father, his brother, and his sister, the possibility of the four of them joining in the business of manufacturing candy but, instead, Marvin started such a business as a sole proprietorship in Dallas, Texas. A cookie business was purchased in July 1944. Marvin continued to operate both businesses until they were sold in February 1946. The businesses were conducted under various names but will be referred to herein for convenience as the Dallas Candy Company. Marvin's father at all times *205 material hereto was employed on a full-time basis as City Marshall at Cameron, Texas, about 135 miles from Dallas. Marvin's brother was in the United States Army from 1940 until early in 1946 and re-enlisted within three months. He was outside the United States during 1944 and until his discharge. Marvin's sister joined the WACS in the fall of 1943. She was discharged later than her brother. None of those three persons had had any experience in the business of manufacturing candy. Marvin, his father, his brother, and his sister signed a document reciting that they "have this the first day of January, 1944, associated ourselves together as a partnership under the terms and conditions as follows". Marvin had the document prepared. It had to be sent by mail to the brother and sister to obtain their signatures. That agreement was not entered into on January 1, 1944 but was prepared and signed several months after that date. It provided that "The partnership shall own and operate the business now under the management of Marvin Lunsford, as well as those which he shall hereafter acquire for the partnership", but gave Marvin the right to engage in other businesses on his own account. The *206 agreement provided that the capital should consist of $ 6,000 and Marvin's interest in the partnership should be 40 per cent while that of the other three should be 20 per cent each. It also stated "Marvin Lunsford has advanced the entire original capital of the partnership but is to be reimbursed by the remaining partners to the extent of their respective interests from the net profits of the partnership hereafter earned," or from the ultimate distribution of the assets of the partnership but not from any other sources. Marvin was to be "the sole and only manager of the partnership with unrestricted powers and duties" and was to receive a salary of $ 500 per month before profits were computed. The books and records of the business as of June 30, 1944 showed that it was a sole proprietorship. No money or other property was ever transferred or contributed to or for the use of the Dallas Candy Company business by Marvin's father, brother, or sister. Marvin reported all of the income from the business from its inception to the end of 1943. A partnership return was filed for the calendar year 1944 representing that Marvin, his father, his brother, and his sister were partners and *207 that the distributive share of the latter three in the earnings was $ 15,826.65 each. Those amounts were not paid to the individuals. The Commissioner held that those earnings and the earnings for the first seven months of 1945 were taxable to Marvin and Marvin agreed to pay the additional taxes. The record does not contain any partnership return for any period after 1944. Marvin and Eula had a property settlement in February 1945 in connection with their divorce, under which Eula was given a 20 per cent interest in the Dallas Candy Company business. Some time thereafter Marvin, Eula, and Marvin's father, brother, and sister signed a document reciting that they had associated themselves together as a partnership on January 1, 1945. The record does not show how the signatures of the brother and sister were obtained to that document. It provided that "The partnership shall own and operate the business now under the management of Marvin Lunsford, as well as those which he shall hereafter acquire for the partnership" provided that Marvin could enter into any business on his own account. The respective interests were stated to be 20 per cent each. Marvin was to "be the sole and only *208 manager of the partnership with unrestricted powers and duties" so long as he acted for all and was to receive a monthly salary of $ 1,250 to be deducted before the computation of profits. Eula and Marvin's father, brother, and sister signed a document dated " January 1946", stating that they appointed Marvin their attorney to sell the business which they owned in partnership with him "under the names of Dallas Candy Company and Dallas Cookie Company". Marvin and Victor Ballowe signed an agreement, the first paragraph of which was as follows: "This agreement entered into on this the 14th day of February 1946, by and between the Dallas Candy Company and the Dallas Cookie Company, each being a partnership of Dallas County, Texas, acting herein through Marvin Lunsford, a partner, referred to herein jointly as seller and Victor Ballowe, operating as the Southern Maid Baking Company of Waco, Texas, referred to herein as buyer." The agreement provided for the sale of the businesses, but the sellers were to retain accounts and notes receivable, cash on hand and in banks, lease and utility deposits, and automotive equipment. The consideration mentioned was $ 63,000. Marvin retained for *209 himself the right to the name Dallas Candy Company and a trade-mark called "King's Feast". The record does not show that Marvin's father, brother, or sister actually received any money or property into their unfettered control or benefited from any of the earnings or proceeds of the sale of the Dallas Candy Company business. Marvin on his returns for 1944 and for the first seven months of 1945 did not report any more than his "salary" and share of the remaining earnings as described in the written agreements but the Commissioner insisted that he was taxable on an additional 60 per cent of earnings of the business for each period and Marvin agreed to pay the tax as thus computed by the Commissioner. Marvin opened bank accounts in Dallas for his brother and sister. He retained the right to draw on those accounts. The record does not show what funds went into those accounts or what happened to them thereafter. Marvin, his father, brother, and sister did not, and did not intend to, join together, in good faith and acting with a business purpose, in the conduct of the candy business prior to or during the period from August 1, 1945 until the business was sold in February 1946. *210 Marvin purchased two lots on Ross Ave., Dallas, early in 1946. He believed sufficient funds were then available to start a furniture business. A request to replace two houses on the lots with a building to house a furniture business was denied by the Civilian Production Administration and Marvin retained ownership of the property. Marvin, in August 1946, purchased a candy business in his own name from Tom Anagnos. He gave Anagnos $ 5,000 in cash and his check for $ 11,799.39. Marvin operated the business for a few weeks and then on September 10, 1946 sold it for $ 20,000 to Marvin's Inc., retaining for himself a trademark called "Pecan Krisp". Jetta reported a short-term capital gain of $ 2,719.37 on her return for 1946 and included half of that amount in her income. That gain is intended to represent the gain from the sale made on September 10, 1946, described above. The record does not show that Marvin reported any gain from that transaction in his income for his fiscal year ended July 31, 1947. The correct gain from the transaction was $ 3,200.61. Marvin purchased the stock of Baker-Hartt Corporation in the late summer of 1946. That corporation was engaged in a candy manufacturing *211 business at Farmersville, Texas. Marvin paid $ 185,000 in cash for the stock and agreed to assume a tax obligation of the corporation, the amount of which is not shown by the record. $ 27,000 of the cash was obtained through a loan from a bank. Marvin incorporated Marvin's Inc. on September 27, 1946, to engage in the business of manufacturing candy. Its capital stock consisted of 2,000 shares of $ 100 par value stock. Marvin borrowed $ 200,000 from a bank on a note dated September 26, 1946, and signed "Marvin Lunsford - Trustee." He then paid the $ 200,000 to the corporation for all of its capital stock. Baker-Hartt Corporation distributed its assets to Marvin in complete liquidation. Marvin's Inc. paid Marvin $ 200,000 for the assets of Baker-Hartt Corporation and Marvin then repaid the $ 200,000 to the bank which had loaned it. Marvin's Inc. did not assume either the tax liability of Baker-Hartt Corporation or the bank loan on which the $ 27,000 had been borrowed. The stock of Marvin's Inc. was issued at incorporation, 1300 shares in the name of Marvin, 50 shares in the name of Jetta, 50 shares in the name of Marvin's secretary, and 600 shares in the name of Marvin as trustee of 200 *212 shares each for his father, brother, and sister. Marvin, as trustee, transferred 200 shares each to his father, brother and sister on December 11, 1946 and the latter three persons transferred those shares back to Marvin on January 1, 1947. Marvin surrendered 480 of his shares to the corporation on March 10, 1947, and under date of March 31, 1947, $ 48,000 was entered as a credit in an account on the books of the corporation entitled "Due from Stockholders" which just prior to that time showed a debit balance of $ 45,389.02. Marvin realized no gain as a result of surrendering the 480 shares. The words "This certificate is subject to the provisions of a stockholders agreement, dated September 25, 1946" were typed on each stock certificate issued by Marvin's Inc. but the record does not show what that agreement was. The officers and directors of Marvin's Inc. were Marvin, president, manager and director; Jetta, vice-president and director; and Marvin's secretary, secretary, treasurer and director. Marvin had no agreement with Marvin's Inc. in regard to compensation for his services. Marvin purchased two pieces of real estate on Denton Drive, Dallas, in his own name in the fall of *213 1946 as a site for a new candy manufacturing plant. The record does not show the purchase price or how it was to be or was paid. Marvin's Inc. paid at least $ 17,500 in 1947 on account of the purchase price of the Denton Drive properties. The total debits in the account on its books are $ 35,700. Marvin's Inc. paid the taxes owed by Baker-Hartt Corporation in an amount and at a time not shown by the record. The amount paid was at least $ 15,000. Marvin borrowed $ 13,500 from Marvin's Inc. in the fall of 1946 for use in payment of his income taxes. He gave the corporation his personal note for that amount and it was reflected in a notes receivable entry dated April 30, 1947 on the corporate books. Marvin's Inc. paid the $ 27,000 bank loan obtained in connection with the purchase of stock of Baker-Hartt Corporation. The record does not show the date of payment or how it was recorded on the corporate books. Marvin, in June and July 1947, had a number of entries made on the books of Marvin's Inc. in an effort to show that amounts were due him, for royalties, for expenses of the corporation paid by him and for salaries, which would offset amounts which he owed the corporation. A petition *214 in bankruptcy was filed against Marvin's Inc. by a creditor at or shortly after July 31, 1947. The assets of Marvin's Inc. were sold in the bankruptcy proceeding in the fall of 1947. The trustee in bankruptcy obtained a judgment in the District Court against Marvin which was affirmed on July 14, 1949 to the extent of $ 88,439.02 by the Court of Appeals for the Fifth Circuit which held in , that Marvin was obligated to pay the trustee $ 45,389.02 because his attempt to cancel his obligation of that amount by turning in common stock of the par value of $ 48,000 "was bare faced and inexcusable appropriation to his own personal use of funds of the corporation" as well as "the deliberate misuse and abuse of a practically solely owned corporation"; he was obligated to repay salaries of $ 16,920 because they "represented a sheer misappropriation of funds" occurring in the course of "his steady drive to despoil the company" which he treated "as his alter ego"; he was obligated to return pretended royalties amounting to $ 12,630 because they were just another of the devices by which Marvin "was enabled to carry out his purpose of milking the corporation *215 dry"; and, finally, he was obligated to repay $ 13,500 advanced to pay personal income taxes because his efforts to offset that obligation were unavailing in view of the company's precarious condition for which he was responsible. The District Court's judgment had included $ 13,613.84 for expenses claimed by Marvin as incurred in connection with the operation of the corporation and for which he was reimbursed. The Court of Appeals reversed the District Court in that respect with directions to the District Court to reexamine the expense accounts in order to determine what items were properly chargeable to the corporation and so not recoverable from Marvin. The record does not show that the stock of Marvin's Inc. was worthless on July 31, 1947. Marvin reported on his return for his fiscal year ending on July 31, 1947 $ 10,795.77 as one-half of his salary from Marvin's Inc. Jetta, on her return for the calendar year 1946, reported $ 3,195.77 as one-half of Marvin's salary from Marvin's Inc. and on her return for the calendar year 1947, she reported $ 7,600 as one-half of his salary from Marvin's Inc. The correct community income from Marvin's salary from Marvin's Inc. for his fiscal year *216 ended July 31, 1947 was $ 11,443.96. Marvin was the owner, during at least a part of his fiscal year ended July 31, 1947, of the trade-marks "King's Feast" and "Pecan Krisp". He had an arrangement with Marvin's Inc., the details of which are not shown by the record, whereby that corporation was to pay him royalties for the use of those trade-marks. The record does not show how much the corporation actually paid Marvin during his fiscal year ended July 31, 1947 as royalties or what additional amount it accrued as royalties due him up to that date. Jetta, on her return for the calendar year 1947, reported "royalties" of $ 30,636.68 as a short-term capital gain. Marvin had no income from royalties for his fiscal year ended July 31, 1947. Marvin assisted the manager of Marvin's Inc., to obtain a home, known herein as the Colgate house, by lending him $ 4,000 to use as a down payment. The manager gave Marvin his note for $ 4,000 secured by a second mortgage which Marvin then transferred to Marvin's Inc. for $ 4,000. The manager left the employ of the corporation and Lunsford obtained title to the property as a result of purchasing the first mortgage for $ 13,893.41. He sold the property prior *217 to July 31, 1947 for $ 19,000. Expenses of the sale amounted to $ 1,174.19. Marvin did not realize a profit on that transaction. Marvin, during his fiscal year ended July 31, 1947, was engaged in the business of buying and selling used automobiles. He kept a card for each automobile purchased on which was correctly recorded the data pertaining to the purchase and sale of that automobile. The petitioners correctly reported the income from that business on their returns. Marvin loaned Robert L. Knetzer $ 17,500 and received his note for that amount dated October 18, 1946 due January 1, 1947. He loaned him an additional $ 20,000 and received his note for that amount dated March 20, 1947 due May 1, 1947. Marvin, using his secretary's name, loaned Knetzer an additional $ 5,000 for which Knetzer gave his note in that amount dated March 20, 1947 due May 1, 1947. Knetzer was to furnish Marvin used automobiles. Marvin received four cars from Knetzer Motor Sales Company during his fiscal year ended July 31, 1947 having a total value of $ 13,699 but the record does not show whether or not they were to be credited against the loans. He received a car from Knetzer in 1948 valued at $ 3,117 which was *218 credited on the loans. Marvin received no other cars and no other payments to be credited on the notes. The record does not show when, if ever, the notes became worthless. They had not become worthless up to July 31, 1947. Marvin loaned C. V. Robbins $ 10,000 and received his note for that amount dated January 12, 1948 due April 12, 1948. He loaned Robbins an additional $ 15,000 and received his note for that amount dated February 3, 1948 due May 3, 1948. Robbins was an automobile dealer and was to use the money loaned him to obtain used cars for Marvin. Marvin received eight payments from Robbins in the total amount of $ 6,800. The last payment was received in November 1949. No cars were received from Robbins and there were no other payments on the notes. The unpaid portion of the notes was not worthless on July 31, 1949 and the record does not show when, if ever, the debts became worthless. Neither petitioner claimed deductions for bad debts on account of the loans to Knetzer and Robbins for any taxable year material hereto. The record does not show whether or not Marvin is entitled to a net operating loss carry-back from either his fiscal year ended July 31, 1948 or that ended *219 July 31, 1949. The Commissioner explained his determination of the deficiency against Marvin Lunsford for the fiscal year ended July 31, 1946 as follows: NET INCOME
Net income per revenue agent's
report dated December 26, 1946, to which you agreed by signing
Form 870
$ 115,742.80
(a) Adjustments
None
Corrected net income
$ 115,742.80
(a) Explanation: Your claims for refund were based on the
contentions (1) that an alleged partnership
was bona fide for tax purposes, (2) that
income had been improperly apportioned
between you and your wife, and (3) that
carry-back net operating losses of the year
ended July 31, 1948 reduced taxable income
of the fiscal year ended July 31, 1946.
It is held that your business operation was
not a partnership, and since your second
point was based upon the first, that income
was properly apportioned. The claim of a
net loss carried back from the fiscal year
ended July 31, 1948 is disallowed since no
loss for such purpose was found, as shown
below: Net loss per return, Fiscal year
July 31, 1948
$ (5,778.75)
Deductions not substantiated: Automobile sales
$ 2,136.66
Legal and accounting
3,706.22
Service Brokerage
Company
398.37
Total
6,241.25
Net income
$ 462.50
TAX LIABILITY
Tax on $115,742.80 per revenue
agent's report dated December 26,
1946
$77,594.67
Tax per amended return filed February 28, 1944, n.1 Account #320001
73,405.00
Deficiency in tax
$ 4,189.67
The deficiency is the amount of the
tentative allowance of an over-
assessment based upon the carry-
back net loss from the fiscal year
ended July 31, 1948 which you
claimed and which is disallowed.
Amount to be re-assessed
$ 4,189.67
*220 n.1 The year "1944" is obviously an error. The only evidence of the notice of deficiency is the copy attached to the petition. It is not possible to tell from the record whether the error was made by the petitioner in copying the notice or whether the error appeared in the original notice. The record does not show the correct year. The Commissioner, in determining the deficiency for 1946 against Jetta, computed the correct tax liability to be $ 14,872.66, deducted the income tax liability shown on the return in the amount of $ 10,943.02 and arrived at the deficiency of $ 3,929.64. The Commisisoner, in determining the deficiency against Jetta for that year, added $ 7,082.73 to $ 28,256.40, the net income shown on her return, to arrive at net income of $ 35,339.13 and in determining the deficiency against her for 1947, he added $ 31,911.08 to $ 1,642.53, the net income shown on her return, to arrive at net income of $ 33,553.61. The Commissioner, in determining the deficiency against Marvin Lunsford for the fiscal year ended July 31, 1947, added $ 39,855.75 to $ 7,487.08, the net income shown on his return, to arrive at net income of $ 47,342.83. The additions to the income of Jetta for the two taxable years and the addition to income of Marvin for his fiscal year ended July 31, 1947 resulted principally from the Commissioner's determination that Marvin had realized income as follows, one-half of which was held to be taxable income of Marvin and the other one-half of which was put into the income of Jetta either for 1946 or 1947 depending upon the year in which it was earned: (a) Royalties
$ 30,638.04
(b) Benefits from Marvin's
28,700.92
(c) Gain on sale of assets to Marvin's
6,841.32
(d) Gain on sale of Colgate House
2,106.64
(e) Loss on stock of Marvin's, Inc.
3,005.78
(f) Automobile sales
6,059.13 The Commissioner made no other adjustments to Marvin's income as reported for the fiscal year ended July 31, 1947 but he allowed Jetta for 1947 a deduction of $ 759.38 not claimed by her, he increased from $ 50 to $ 716.77 her income from interest to make it equal that reported by Marvin, and he reduced "Other and optional standard deduction" from $ 6,151.03, claimed by her, to $ 4,560.69 on the ground that "Legal expense of a suit by the trustee of Marvin's, Inc. still unsettled, is held not to be an ordinary business expense." The Commissioner explained the six principal adjustments listed above as follows: "(a) Royalties received from Marvin's, Inc., for the use of trademarks and tradenames owned by you personally were reported by you as short-term capital gains and applied against the improperly computed long-term capital losses, resulting in a net capital loss. This adjustment is to properly classify the royalty payments received under a claim of right and without restriction as to use as ordinary income. "(b) Payments received from Marvin's, Inc., for expenses claimed, paid without restriction, as to use were, as follows: in 1946
$ 4,159.18
in 1947
24,541.74
Total
$ 28,700.92
"These amounts are includible under section 29.23(a)(2) (b), Regulations 111. They were received unconditionally in addition to salaries received in these years for services actually rendered by you as president and general manager of Marvin's Inc. All the amounts were received under a claim of right and without restriction on use. "(c) Gain on the sale to Marvin's, Inc, of assets acquired from Tom Anagas is adjusted as follows: Selling price
$ 20,000.00
Cost
11,799.00
Gain
$ 8,201.00
Amount reported (by your wife)
1,359.68
Adjustment
$ 6,841.32
"(d) Gain on the sale of the Colgate Street house is adjusted below: Selling price per broker's state-
ment
$ 19,000.00
Less second lien note
2,000.00
Net amount to you
$17,000.00
(Selling expenses of $ 1,174.19
were charged to the corporation)
Cost basis
13,893.36
Total profit
$ 3,106.64
Reported in item (b) above
1,000.00
Additional income
$ 2,106.64
"(e) Between October 10,
1946, and March 10,
1947 you sold
$48,000.00 par value
of Marvin's, Inc. to
the corporation for
$45,389.02
Which had a cost to
you of
43,383.24
Profit realized
$ 2,005.78
You took a deduction in the
Iscal year 1947 for loss on
worthless stock of Marvin's,
Inc. of
1,000.00
The corporation was declared
a bankrupt on October 27, 1947.
The stock was not worthless
prior to that date. The deduc-
tion claimed is not allowed in
the fiscal year ended July 31,
1947.
Total increase
$ 3,005.78
"(f) Profit on sale of cars is estimated on the basis of a percentage of sales (15%) which has been determined by the experience of other dealers, for the reason that no records were available. Estimated net profit (15% of
$ 49,975.00)
$ 7,496.25
Amount per return
1,437.12
Adjustment
$ 6,059.13"
Opinion MURDOCK, Judge: An important issue for decision in this case is whether Marvin's father, brother and sister were partners in the operation of the Dallas Candy Company, so that 60 per cent of the income of that business for the period August 1, 1945 until it was sold in February 1946 and a like portion of the sales price was not income of Marvin, as reported by him in an amended return for his fiscal year ended July 31, 1946, but was taxable in equal shares to his father, his brother and his sister. The parties agree that Eula was entitled to 20 per cent of the net income of that business for that period because she received a 20 per cent interest in that business in February 1945 as a property settlement in connection with her divorce from Marvin. This issue affects Jetta only through her rights to community property earnings of Marvin during the calendar year 1946. Findings have been made of all material facts which fairly may be drawn from a difficult record. Marvin was not always forthright, consistent, accurate and definite in his actions and statements. The Court has observed him. He was the only alleged partner to testify. The Court has not been able to determine just what the facts are in some instances and in others has had to come to conclusions from conflicting evidence. Marvin must be held responsible for most of the difficulties presented in this record and some doubts have been resolved against him since he had the burden of proof. Cf. . A written agreement, signed by Marvin, his father, his brother and his sister, is in evidence to support Marvin's contention that there was a partnership in which his interest was only 20 per cent during his fiscal year ended July 31, 1946. There was another similar agreement for a prior period. The importance of those contracts as evidence is not underestimated but they are not necessarily controlling. Likewise other evidence, tending to show that such a partnership existed, at least in form, is not being overlooked. The effect of that evidence can only be overcome by the presence of other more convincing evidence that the alleged participation of the three in the partnership lacked substance and they were not intended to be and were not real partners in the conduct of the business during the period from August 1, 1945 until the sale in February 1946. The record contains evidence which shows that none of the three contributed to, participated in, or benefited from the business as a partner at any time during its existence but Marvin alone contributed capital and vital services, managed it without aid or interference, dealt with the business and all proceeds therefrom as his own, and alone benefited from it, except for the 20 per cent interest which belonged to his former wife during the period in question. It is admitted that Marvin reported all of the earnings of the business for 1943 as his community income. He did not report for 1944 and for the first seven months of 1945 any more than his "salary" and share of the remaining earnings as described in the written agreements but the Commissioner insisted that Marvin was taxable on an additional 60 per cent of the earnings for each period and Marvin agreed to pay the tax as thus computed by the Commissioner. Marvin reported no more than "salary" and 20 per cent of earnings for the last seven months of the business on his original return for his fiscal year ended July 31, 1946, but the notice of deficiency states that he filed an amended return in which he reported the additional 60 per cent and signed an agreement to the immediate assessment of the taxes due thereon. The Commissioner made no change in the income reported in the amended return. The deficiency resulted from the disallowance of an overassessment, theretofore temporarily allowed for a net operating loss carry-back from 1948. Thus, the issue is not whether the Commissioner erred in adding to the income which Marvin reported but instead is whether Marvin overstated his income on his final return for the fiscal year ended July 31, 1946 by including therein 60 per cent of the earnings of the Dallas Candy Company representing the alleged shares of his father, brother and sister. Marvin, in reporting his "salary" plus 80 per cent of the remaining income of the business for that period and accepting the full tax liability for the prior periods, must have been satisfied in his own mind that his father, brother and sister were not genuine partners in the conduct of the business. There was no business purpose or advantage in having the father, brother or sister as a partner. It is not claimed that the brother worked in or contributed services to the business. Marvin said he discussed the business with his father when they met and claims that his sister was employed in the business for a short time just before it was sold. However, none of the three contributed any vital or important services to the business and they were not expected or, indeed, permitted to interfere or participate in the management of that business. Duties elsewhere occupied their full time and attention during practically the entire period that Marvin operated the business. They had nothing to offer to the business in the way of experience or ability and they made no capital contributions, as their first written agreement stated. Marvin knew that the success of the candy business would be short-lived and would end when sugar again became plentiful. So this is not a case where Marvin was holding on to the business until his brother and sister could get out of the military service. No witness has testified that a distribution was ever actually made to the father, brother or sister. There is no evidence of any check having been issued to the brother or the sister or of cash having been paid to any of the three as a distribution or withdrawal of a share of earnings or capital of the Dallas Candy Company. The record is confusing as to whether the father received an ultimate benefit from a check mentioned in a letter from Marvin for payment of the tax on the father's distributive share of the earnings of the alleged partnership for the first seven months of 1945 on which earnings Marvin later agreed he was taxable. No deposit in a personal bank account of the father, brother or sister has been identified as having come from a withdrawal or distribution. The evidence does not show that any of the three became richer in any way as a result of being partners in the Dallas Candy Company. No books of the business were offered in evidence and Marvin testified that they had been destroyed in a fire. The principal evidence which must be relied upon to show distributions to and withdrawals by the father, brother and sister is a summary made by an accountant, apparently after the books were no longer available. He made the summary from his working papers on which he had previously set down information taken from the books. This summary, if it correctly reflects book entries, does not show that the father, brother or sister actually received any distributions or withdrawals but only that entries were made on the books under Marvin's direction and control. He was not above having book entries made to suit his own purposes. Furthermore, if distributions or withdrawals were recorded when he used funds of the business to purchase property in his own name such as bonds, real estate or corporate stock, on the pretense that he was acting for himself and the other three, then such entries were misleading because such use of the funds did not represent effective distributions to the father, brother or sister since they did not ultimately benefit from any such use of the funds of the business. Marvin opened bank accounts in the names of his brother and sister but retained control over the accounts and the record does not show what funds went into those accounts or what happened to them after they went in. A finding that earnings of the business for the period in controversy went out of the control of Marvin and into the unfettered control of one of the other three so that the latter benefited therefrom is not justified because the record is contradictory, confusing and inconclusive on the point. The indications are that most of the earnings went to pay Marvin's taxes, to buy real estate taken in his name and to buy the stock of Baker-Hartt Corporation from which he alone benefited. The leading case on this general subject is . The Court pointed out in that case "that there is no special concept of 'partnership' for tax purposes" but the question is "whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." At another place the Court said: "To hold that 'individuals carrying on business in partnership' include persons who contribute nothing during the tax period would violate the first principle of income taxation: that income must be taxed to him who earns it." That opinion has been studied and a conscientious effort has been made to follow the guiding principles set forth therein. A careful study of the record in this case in the light of those principles has led to the conclusions that no genuine union for partnership purposes was ever intended as far as the father, the brother and the sister are concerned and that Marvin not only earned the income here in question with his own capital and labor but also disposed of it as his own. [2] No attempt has been made to set forth all of the reasons for this conclusion because that would require an exhausting discussion of a record full of inconsistencies and confusion. *221 The next question is the basis to Marvin of the candy business which he purchased from Anagnos. Both parties agree that the basis included $ 11,799.39 which Marvin paid by check to Anagnos. Marvin testified that the cost of the business to him was $ 16,799.39 of which $ 5,000 was paid in cash at the request of Anagnos. The Commissioner points out that there is no corroboration in the record for Marvin's statement under oath that he paid $ 5,000 in cash. That is true and although Anagnos was dead at the time of the trial, nevertheless some corroborating evidence might have been available. Corroboration would not have been amiss. However, there is no evidence that he did not pay the $ 5,000, and a finding has been made that he paid it. Marvin operated the business for a few weeks between the time he bought it and the time he sold it and he may be making the claim that he spent money for materials during that *222 period which should be taken into account in computing the profit. However, it is not shown that his basis exceeded $ 16,799.39 and a finding has been made that the correct profit from the transaction was $ 3,200.61. The Commissioner determined that Marvin realized a profit of $ 3,106.64 on the sale of the Colgate house. Marvin's Inc. had a second mortgage on that property for $ 4,000. Marvin bought the first mortgage for $ 13,893.41. He then obtained title to the property and sold it for $ 19,000. The expenses of the sale amounted to $ 1,174.19. Thus the net proceeds of the sale did not equal the amount which Marvin and the corporation had invested in the property and no profit resulted from the sale. It appears that Marvin entered into the transaction to protect the corporation and gave it all proceeds of the sale in excess of his costs and expenses. The Commissioner erred in taxing the petitioners with any profit on that sale. The evidence upon which the petitioners depend to overcome the Commissioner's determination that community income was realized by Marvin for his fiscal year ending July 31, 1947 in the amount of $ 30,638.04 from royalties, $ 28,700.92 from alleged expense allowances, *223 and $ 2,005.78 from the surrender of 480 shares of stock of Marvin's Inc., and to show that excessive salary from Marvin's Inc. was reported for that period, is incomplete and inconclusive in a number of important respects. However, the petitioners' case is benefited by the opinion of the Court of Appeals for the Fifth Circuit in , referred to by the witnesses and of which it is proper to take judicial notice. The trustee in bankruptcy sued Marvin and in the District Court won a judgment for $ 100,000 which Marvin appealed. The appellate court recognized that Marvin had misappropriated funds of the corporation to his own personal use and had attempted to offset his indebtedness to the corporation by book entries showing salary, expenses, and royalties due him but to which he was not entitled. Its opinion shows that large sums which the Commissioner has determined were income to Marvin for his fiscal year ending July 31, 1947 were not lawfully his and some of the amounts were not actually received by him but were improperly credited to his account in an unlawful effort to offset his indebtedness. The bankruptcy proceeding began on July 31, 1947. It *224 also appears that Marvin's misappropriations, which the Commissioner sees as income, probably included some of the capital which Marvin himself had invested in the business. It is difficult to derive income in such a way. An effort has been made to give as much effect as the record permits to the opinion of the Court of Appeals. However, the court was considering the entire history of the corporation and was not limited to Marvin's fiscal year ended July 31, 1947. It is not possible to relate exactly the figures used by the Court of Appeals to those used by the Commissioner in determining the community income of Marvin for his fiscal year ended July 31, 1947, nor to some incomplete and unexplained corporate accounts introduced in the present record. The Commissioner determined that Marvin received royalties of $ 30,638.04 from Marvin's Inc., and there is evidence that royalties of about that amount were accrued up to July 31, 1947. There is also testimony that Marvin had an arrangement with the corporation whereby it was to pay him royalties for the use of trade-marks owned by him. The opinion of the Appellate Court in the bankruptcy proceeding indicates that he actually withdrew *225 $ 12,630 of royalties but that he was not entitled to any royalties. Amounts accrued on the books of the corporation which Marvin did not actually receive would not be income to him. However, it appears that he received $ 12,630 of royalties during his taxable year ended July 31, 1947 under a claim of right and retained those for a number of years. It is held that the $ 12,630 was income, but the remainder of the amount included by the Commissioner as royalties was not. The Commissioner determined that Marvin received $ 28,700.92 from Marvin's Inc. "for expenses claimed, paid without restriction as to use." The judgment of the District Court included $ 13,613.84 for expenses claimed by Marvin incurred in connection with the operation of the corporation but for which he was reimbursed. The Court of Appeals reversed the District Court in that respect with directions to re-examine the expense accounts in order to determine what items were properly chargeable to the corporation and not recoverable from Marvin. The record does not show how the Commissioner arrived at his figures or what the District Court found on the remand, but it would appear that the maximum amount of possible income which *226 Marvin could have had from this source was $ 13,613.84, and, for lack of evidence that it was any lesser amount, that amount is held to have been income for his fiscal year ended July 31, 1947, because he received it under a claim of right and retained it for several years at least. Jetta reported as her share of salaries from Marvin's Inc., $ 3,195.77 for 1946 and $ 7,600 for 1947, while Marvin reported salaries of $ 10,795.77 for his fiscal year ended July 31, 1947. The Commissioner, in determining the deficiencies against them, made no change in those items. Nevertheless, both petitioners allege that it was error for them to report the salaries. Marvin testified that he had no agreement with the corporation in regard to salaries. However, he was entitled to reasonable compensation for his services to the corporation as president and general manager. A loose-leaf sheet from the books of Marvin's Inc. entitled "Executive Salaries", introduced in evidence, indicates that the total salaries through July 31, 1947 amounted to $ 24,917.43, but the entries supporting that total were not explained. Thereafter, additional salary was recorded in that account in the amount of $ 3,446.53. The Court *227 of Appeals held that the judgment of the District Court for the return of salaries in the amount of $ 16,920 was well supported. We are unable to conclude from the entire record that the amounts reported by the taxpayers as salaries were not properly taxable to them as reported. They also reported a small amount of salary from Baker-Hartt Corporation, but no evidence was introduced with respect to it and no change from the amount reported is justified by the record. The fifth issue arises from the action of the Commissioner in holding that Marvin realized a profit of $ 2,005.78 when he surrendered 480 shares of stock of Marvin's Inc. to the corporation for the purpose of canceling his indebtedness to the corporation in the amount of $ 45,389.02. The Court of Appeals for the Fifth Circuit in , described that transaction as "bare faced and inexcusable appropriation to his own personal use of funds of the corporation impairing, indeed depriving the corporation of, the working capital needed to do business and rendering it completely vulnerable to the insolvency which almost immediately ensued and the consequent bankruptcy." It held that it was a "deliberate *228 misuse and abuse of a practically solely owned corporation, and no justification whatever for it in law or in fact may be found." It directed judgment against Marvin for the amounts which he was trying to cancel by surrendering the stock. Marvin had no gain from the surrender of the stock. The Commissioner, in determining the deficiency, explained: "You took a deduction in the fiscal year 1947 for loss on worthless stock of Marvin's Inc. of $ 1,000. The corporation was declared a bankrupt on October 27, 1947. The stock was not worthless prior to that date. The deduction claimed is not allowed in the fiscal year ended July 31, 1947." Marvin has not introduced evidence to show that his stock in Marvin's Inc. was worthless on July 31, 1947, the last day of his last fiscal year involved in this proceeding. Consequently the Commissioner's determination tha the stock was not worthless until the later date must be approved. One of the errors assigned by Jetta for her calendar year 1947 is the "Failure to allow deductions for losses on capital stock owned by petitioner and her husband in Marvin's Inc. against alleged capital gains occurring in calendar year 1947." Section 23 (g) (2) provides *229 that a loss on securities becoming worthless shall be considered a loss from the sale or exchange on the last day of such taxable year of capital assets. The Commissioner, in determining the deficiency against Jetta for 1947, made no change in this item and the explanation which he gave for disallowing the loss to Marvin for his fiscal year ended July 31, 1947 would indicate that in his opinion the stock had become worthless on October 27, 1947 which was within Jetta's calendar year 1947. No decision of the Court is required on this point. Marvin kept a card record of each used car which he bought showing the cost, any repairs and other charges and the amount received from the sale. The petitioners reported their community income from that business in accordance with those cards with an exception too trivial to make any difference. The Commissioner, distrusting the cards for some reason not fully revealed in the record, took the gross sales reported and concluded that 15 per cent thereof represented net income. The Court has concluded from the evidence that the cards correctly reflected the income from the business and that no change should be made in the income reported from this *230 business. [3]
It is difficult to tell from the petitions just what issue, if any, is raised with respect to the Knetzer loans. However, the petitioners contend in their briefs that the Knetzer loans were obtained through fraud and each was worthless as soon as the money was advanced. They even mention a carryback to 1945, a year not before the Court. The record shows that several of the used cars sold by the petitioner were obtained from Knetzer Motor Sales Company, some in 1946 and more in the first two months of 1947. It is not clear whether or not those should be applied against the loans. It is clear that a car received from Knetzer in 1948 was to be and was applied against the loans. The record does not justify a finding that these loans were worthless at any time material hereto. The petitioners have not referred to the Robbins loans in their petitions but claim in their briefs that the loans to Robbins became worthless in Marvin's fiscal year ended July 31, 1949, that the deductions *231 therefor should be included in computing a net operating loss carry-back from that year to his fiscal year ended July 31, 1947. Just how this would work out in the case of Jetta who is on a calendar year basis is not obvious. A payment was made on this loan in November 1949 which was after the close of Marvin's fiscal year ended July 31, 1949. The record, as a whole, does not justify a finding that this loan became worthless at any time material hereto. This makes it unnecessary to consider whether there is any other reason to deny a carry-back from 1949. Apparently Marvin has abandoned his claim for a carry-back from his fiscal year 1948 to his fiscal year 1946. The only evidence in the record on the subject is his return for his year ended July 31, 1948. The Commissioner, in his notice of deficiency to Marvin for his fiscal year 1946, disallowed the carry-back and explained that instead of a loss, as shown on the 1948 return, there was net income for that period. Thus, whether or not Marvin has abandoned the issue, the record does not show that he is entitled to the carry-back. The last issue is whether the deficiency against Jetta for 1946 should be increased by the disallowance *232 of a net operating loss carry-back from 1948. The Commissioner tentatively allowed an overassessment for 1946 on that basis and apparently forgot to disallow it in determining the deficiency. He here makes a balated claim for an increased deficiency and must assume the burden of proof on this issue. The only evidence on the point is Jetta's return for the calendar year 1948 which shows a loss and does not show that a carry-back was not proper. Therefore, on this issue we leave the parties as we found them which makes unnecessary any action on Jetta's objection to the lateness of the claim for the increased deficiency. Decisions will be entered under Rule 50. Footnotes
2. The District Court for the Northern District of Texas, Dallas Division in Gearner, Admr. v. Scott et al., - Fed. Supp. - (10/1/51), appeal authorized, held that there was a valid partnership which included the father, brother and sister, but on what evidence we do not know.↩
3. There might be some question as to whether Jetta was correct in reporting her entire half of the income from this business as income for 1947 but that point is not raised and is not decided.↩